**UNITED STATES COURT OF APPEALS FOR VETERANS CLAIMS**

No. 98-1542

GERALD L. ERICKSON, APPELLANT,

V.

TOGO D. WEST, JR.
SECRETARY OF VETERANS AFFAIRS, APPELLEE.

On Appeal from the Board of Veterans' Appeals

(Decided    May 12, 2000    )

*Jeffrey Wood*, of York, Pennsylvania, was on the brief for the appellant.

*Leigh A. Bradley,* General Counsel; *Ron Garvin*, Assistant General Counsel; *Mary Ann Flynn*, Acting Deputy Assistant General Counsel; and *Brian B. Rippel*, all of Washington, D.C., were on the brief for the appellee.

Before HOLDAWAY, IVERS, and STEINBERG, *Judges*.

STEINBERG, *Judge*, filed the opinion of the Court. HOLDAWAY, *Judge*, filed a dissenting opinion.

STEINBERG, *Judge*: The appellant, veteran Gerald L. Erickson, appeals through counsel a July 30, 1997, Board of Veterans' Appeals (BVA or Board) decision that determined that a debt based on an overpayment of Department of Veterans Affairs (VA) benefits had been properly created. Record (R.) at 3. The appellant has filed a brief, and the Secretary has filed a brief. This appeal is timely, and the Court has jurisdiction pursuant to 38 U.S.C. §§ 7252(a) and 7266(a). For the reasons that follow, the Court will reverse the BVA decision.

**I. Background**

Although no DD-214 Form is contained in the record on appeal (ROA), the Board decision stated that the veteran had active service from August 1953 to August 1957 and from August 1961

to November 1976. R. at 2. He has been in receipt of a 100% combined VA service-connected-disability rating for bilateral multiple sclerosis (MS) of the upper and lower extremities since at least 1980. R. at 25. In June 1992, a VA regional office (RO) awarded him special monthly compensation (SMC) "based on a determination that the loss of use of both lower extremities . . . is permanent and total." R. at 33. At that time, the veteran was also awarded SMC based on his being "housebound". R. at 34.

From April to November 1995, the veteran was hospitalized at a VA Medical Center (VAMC) based on the worsening of his MS. R. at 39-43. In May 1995, the veteran's service organization (Paralyzed Veterans of America (PVA)) wrote to the VARO: "As the veteran's representative we wish to advise . . . VA that the veteran is a patient at the [VAMC]. . . . Please obtain report to adjust compensation if required to prevent an overpayment." Supplemental (Suppl.) R. at 2. In November 1995, the RO awarded "increased" SMC "because of the severity of [the veteran's] service-connected disabilities including [his] need for aid and attendance", effective April 1995. R. at 48; Suppl. R. at 4-6. As the basis for the SMC awarded, the RO cited, inter alia, 38 U.S.C. § 1114(*l*) and (r)(1). Suppl. R. at 6. A November 13, 1985, VAMC record indicated that the veteran was "to be transferred to [a nursing home] whenever a bed is available." R. at 40; *see also* R. at 45. On December 5, 1995, the RO received a letter from the veteran's PVA representative that "advised that the veteran was discharged from the . . . VAMC [on] November 13, 1995[,] and placed in a . . . [n]ursing [h]ome under VA contract at the present time" and that noted that "[i]t would appear [that] the veteran may be entitled to SMC R2 [(SMC under 38 U.S.C. § 1114(r)(2))]." R. at 45. The RO responded to the veteran on December 14, 1995, by requesting that he "provide information from the nursing home which describes in full the care that is being administered and supervision provided by health care professional(s)." Suppl. R. at 8.

In February 1996, the RO awarded, effective December 5, 1995, "additional aid and attendance allowance under 38 U.S.C. § 1114, subsection (r)(2) . . . on account of [the veteran's] . . . being in need of regular aid and attendance and, in addition, on account of [his] need of a higher level of care". R. at 54. In addition, the RO listed in its decision and continued the prior awards of SMC for aid and attendance that had been made pursuant to 38 U.S.C. § 1114(*l*), and discontinued, effective December 5, 1995, the award that had been made under section 1114(r)(2). R. at 53-54.

2

As a reason or basis for its decision, the RO stated: "The evidence now received records that the veteran is in a nursing home where he is receiving 24[-]hour care by a health care professional care [sic] that is being supervised by a physician." R. at 52. Attached to the letter from the RO notifying the veteran of his award of additional SMC was a VA Form 21-8764. Suppl. R. at 1. That form contained eleven separate, single-spaced sections regarding "VA CHECK DELIVERY", "VA HOSPITALIZATION AND OUTPATIENT TREATMENT", "DENTAL TREATMENT", "ADDITIONAL COMPENSATION FOR DEPENDENTS", "INDIVIDUAL UNEMPLOYABILITY", "VOCATIONAL REHABILITATION", "EDUCATIONAL BENEFITS", "NONASSIGNABILITY AND EXEMPT STATUS OF BENEFITS", "GOVERNMENT LIFE INSURANCE", "CHANGE OF ADDRESS NOTICE", and, finally, at the bottom of the form, the section pertaining to the veteran to whom the form was sent, "CONDITIONS AFFECTING RIGHT TO PAYMENTS". *Ibid.* That final section itself contained eight provisions, the fourth of which stated:

> 4. If your award includes [SMC] due to need for aid and attendance, this additional allowance is ***generally*** subject to reduction from the first day of the second calendar month of admission to hospitalization, nursing home[,] or domiciliary care at VA expense.

*Ibid.* (emphasis added).

Later in February 1996, the RO issued a decision that stated: "Recently it was determined that the veteran's disabilities met the requirements of the highest level of [SMC] provided by law. The evidence now being reviewed . . . confirm[s] the findings in the pervious [sic] decision; therefore, entitlement as previous [sic] established is continued." R. at 59.

A May 8, 1996, VA report of contact indicated: "The veteran was placed at [a nursing home] . . . on 11-13-95 with an indefinate [sic] contract." R. at 67. Subsequently, on May 9, 1996, the RO sent to the veteran a letter proposing to eliminate his increased SMC and to reduce his monthly benefits payments accordingly, based on the fact that the VAMC had "told [the RO that] they approved payment for your nursing home care which began on November 13, 1995". R. at 69. This letter also indicated that the reduction would "result in an overpayment of benefits" that the veteran would have to repay. *Ibid.* On May 14, 1996, the RO received from the veteran's PVA representative a claim "for a VA administrative error in the creation of the debt", stating: "When the veteran left the . . . VAMC for the . . . [n]ursing [h]ome the hospital has obligation [sic] to keep the

adjudication division informed". R. at 75. On May 23, 1996, the RO sent to the veteran a letter denying the claim for administrative error, which, if found, would have eliminated the veteran's liability for any overpayment, and explained that the "overpayment occurred due to a delay in reducing your [SMC] to the hospitalized rate". R. at 81. The veteran timely appealed to the Board. R. at 84, 97. In the July 30, 1997, BVA decision here on appeal, the Board denied the veteran's claim for administrative error and found that "the overpayment was not due solely to error on the part of VA". R. at 7.

## II. Analysis

Pursuant to 38 U.S.C. § 1114(*l*), a veteran who, "as the result of a service-connected disability, has suffered the . . . loss of use of both feet, or of one hand and one foot . . . , or is permanently bedridden or so helpless as to be in need of regular aid and attendance" shall be entitled to increased SMC. 38 U.S.C. § 1114(*l*). In addition, "if the veteran, as the result of service-connected disability, has suffered disability under conditions which would entitle such veteran to two or more of the rates provided in one or more subsections (*l*) through (n) of [section 1114]" (38 U.S.C. § 1114(*o*)) and "is in need of regular aid and attendance, then" he shall be entitled to additional SMC (38 U.S.C. § 1114(r)(1)). If, "in addition to such need for regular aid and attendance, . . . the Secretary finds that the veteran, in the absence of the provision of such care, would require hospitalization [or] nursing home care", then, pursuant to section 1114(r)(2), the veteran shall be entitled to increased, additional SMC "in lieu of the allowance authorized in" section 1114(r)(1). 38 U.S.C. § 1114(r)(2). "For the purposes of clause (2) of [subsection (r) of section 1114], need for a higher level of care shall be considered to be need for personal health-care services provided on a daily basis *in the veteran's home*". 38 U.S.C. § 1114(r) (emphasis added).

In this case, in November 1995 the RO awarded the veteran SMC pursuant to both subsection (*l*) and (r)(1) of section 1114, effective April 1995. Suppl. R. at 5-6. In February 1996, the RO continued the SMC that was being paid to him pursuant to section 1114(*l*) (R. at 53), and discontinued, effective December 1995, the additional SMC under section 1114(r)(1) and in its stead awarded, effective December 1995, additional SMC pursuant to section 1114(r)(2) (R. at 54). *See also* Suppl. R. at 6 (description in November 1995 RO decision of SMC paid prior to February 1996

4

RO decision). At the time of both the November 1995 and February 1996 RO decisions, the veteran was in a private nursing home, to which he had been transferred at VA expense from a VAMC (R. at 40, 45), and there is no question that the RO was specifically aware of these facts at the time of its respective decisions. *Cf. Bell v. Derwinski*, 2 Vet.App. 611, 613 (1992) (holding that RO had constructive knowledge of documents generated by VAMC); *Lynch (Gary) v. Gober*, 11 Vet.App. 22, 26-27 (1997) (discussing pre-*Bell* application of *Bell* constructive-knowledge doctrine), *vacated and remanded on other grounds sub nom. Lynch v. West*, No. 98-7039 (Fed. Cir. Dec. 29, 1998) (table), *reinstated by Lynch v. West*, 12 Vet.App. 391 (1999) (per curiam order). At the time of the November 1995 RO decision (Suppl. R. at 4), the RO had been in receipt of the veteran's PVA representative's May 1995 letter notifying the RO of the veteran's ongoing hospitalization at the VAMC (Suppl. R. at 2). In addition, the November 1995 RO decision listed as evidence received the VAMC hospital summary that indicated that the veteran was to be "transferred" to a nursing home (R. at 40; *see also* Secretary's Brief at 2 (noting that veteran was "transferred directly to a VA-contract nursing home for additional care")). Suppl. R. at 4. In making the February 1996 award, the RO explicitly noted: "The evidence now received records that the veteran is in a nursing home where he is receiving 24[-]hour care by a health care professional care [sic] that is being supervised by a physician". R. at 52. The RO listed as evidence received the December 1995 PVA representative's letter that had reported that the veteran had been transferred to a nursing home "under VA contract at the present time" (R. at 45) and a letter from "Hollis D. Nipe, M.D.", which is not of record. *Ibid.*

Hence, notwithstanding that the facts clearly show that the RO was fully aware of the veteran's situations, the RO in February 1996 continued the award of "[SMC] under 38 U.S.C. § 1114[(*l*),] . . . on account of [the veteran's] being so helpless as to be in need of regular aid and attendance while not hospitalized at government expense" (R. at 52-53), and awarded "additional aid and attendance allowance under 38 U.S.C. § 1114[(r)(2)] . . . on account of [the veteran's] . . . being in need of regular aid and attendance and, in addition, . . . of [his] need of a higher level of care" (R. at 54). These awards were made despite the fact that the veteran did not meet the "higher level of care" criterion set forth in section 1114(r) because he was not receiving "personal health-care services . . . in [his] home", and despite the fact that, contrary to what the RO stated, the veteran *was*

in fact "hospitalized at government expense". R. at 53. Indeed, the BVA specifically found: "There was fault on the part of VA in the creation of the overpayment in awarding the veteran the additional aid and attendance allowance while he was hospitalized in a [VAMC] and while he was in a nursing home under VA contract." R. at 4.

It was not until May 1996 that the RO first proposed to reduce the veteran's compensation benefits by the amount of the SMC to which he was not entitled. R. at 69. The RO concluded that the reduction would "result in an overpayment of benefits which ha[d] been paid to" the veteran (*ibid.*); it is the creation of that overpayment (later determined to be $30,309.00 (R. at 87)) that is the subject of this appeal.

Pursuant to 38 U.S.C. § 5112(a), "[e]xcept as otherwise provided in this section, the effective date of a reduction or discontinuance of compensation . . . shall be fixed in accordance with the facts found." Section 5112(b)(10) provides otherwise, as follows:

> (b) The effective date of a reduction or discontinuance of compensation . . .
>
> (10) by reason of an erroneous award based solely on administrative error or error in judgment shall be the date of last payment.

38 U.S.C. § 5112(b)(10); *see* 38 C.F.R. § 3.500(b)(2) (1999) (effective date of reduction of VA benefits is "date of last payment on an erroneous award based solely on administrative error or error in judgment"). Hence, when an overpayment has been made "by reason of an erroneous award based solely on administrative error", the reduction of that award ***cannot*** be made retroactive to form an overpayment debt owed to VA from the recipient of the erroneous award.

The question in this case, then, is whether the Board properly determined that the overpayment in this case "was not due solely to error on the part of VA". R. at 7. The Board's conclusion that the veteran was at least partly at fault in this case was predicated on the Board's finding that "the veteran had reason to believe that he was not entitled to the full amount of his VA compensation[,] which included the aid and attendance rate." R. at 6. This Court reviews BVA factfinding under a "clearly erroneous" standard of review. 38 U.S.C. § 7261(a)(4). Under this standard "if there is a 'plausible' basis in the record for the factual determinations of the BVA . . . [the Court] cannot overturn them." *Gilbert v. Derwinski*, 1 Vet.App. 49, 53 (1990).

The Board supported its finding as to the veteran's "reason to believe" in large part "based on the information provided to the veteran on VA Form 21-8764". R. at 6. However, that form, in addition to containing a great deal of information that was not relevant to the veteran's particular case and being single-spaced and printed in a reduced typeface, indicated only that his "additional allowance is *generally* subject to reduction from the first day of the second calendar month of admission to hospitalization[ or] nursing home . . . at VA expense." Suppl. R. at 1 (emphasis added). Moreover, in addition to the form being difficult to read, containing mostly irrelevant information, and stating only a general policy, the VA Form 21-8764 was sent as an attachment to the February 1996 RO decision that both continued and *awarded* the additional SMC that VA now seeks to recoup, and did so while expressly recounting the fact of the veteran's hospitalization and subsequent nursing-home admission (R. at 64; Secretary's Brief at 3) and after the RO had specifically inquired of the veteran as to the circumstances of his care at the nursing home (Suppl. R. at 8). In light of all of these facts, the Court cannot find a plausible basis in the record for the Board's conclusion that the veteran had had "reason to believe" that he was not entitled to the full amount of the checks that he had received or was receiving. Moreover, the RO acknowledged not once but three times that the veteran would be or was placed in a nursing home. It did so first in its November 1995 decision that had awarded additional SMC for aid and attendance during the veteran's period of hospitalization (Suppl. R. at 4 (noting that "plans were being made for nursing home placement")), then in its February 1996 decision erroneously awarding SMC (R. at 52), and then again in a second February 1996 decision that reevaluated the veteran's situation and "continued" the entitlement (R. at 59). Thus, the veteran had no reason to believe that the RO was not fully aware of his institutionalization. Quite to the contrary. The Court finds that the veteran had good reason to believe that he *was* entitled to the amounts that he had received under the circumstances described above.

The Secretary relies almost exclusively on this Court's opinion in *Jordan v. Brown*, 10 Vet.App. 171 (1997), to support his position that the BVA correctly determined that the overpayment debt in this case was properly created. Br. at 9. The Secretary is correct that in *Jordan* the Court determined that the appellant there had been "in receipt of . . . information which plainly instructed that remarriage would *preclude* additional compensation, and that *any* payment checks received subsequent to a remarriage were to be *returned* to VA". *Jordan*, 10 Vet.App. at 174

7

(emphasis added). However, in this case, the VA Form 21-8764 cannot be said to have "plainly instruct[ed]" the veteran to take *any* action whatsoever, and, in any event, did not suggest that the veteran should return his checks to VA. Indeed, unlike the appellant in *Jordan*, the veteran in this case *was entitled to at least some, if not most, of the compensation amounts that he was paid*; the only amount to which he was not entitled was the amount of the check that represented increased SMC for aid and attendance. Thus, were he to have returned the checks he would have had to return as well a great deal of compensation to which he was entitled by virtue of his 100% service-connected disability.

Finally, the veteran was at all times within VA control -- he went from a VAMC to a nursing home under VA contract -- and his PVA representative even took the initiative to call to the RO's attention the veteran's current hospitalization in May 1995, to request VA to take action to avoid an overpayment of compensation (Suppl. R. at 2), and also to report to the RO in December 1995 that the veteran was then in a nursing home under VA contract (R. at 45). This is the exact *opposite* of the situation in *Jordan*, where the appellant had "fail[ed] to act in accordance with the rules governing DIC payments" and had admitted that she had not read materials that had been sent to her by VA. *Jordan*, 10 Vet.App. at 175. It is simply unreasonable to conclude that a person who has been institutionalized in a VAMC and then transferred therefrom to a nursing home at VA expense is at fault for not refusing to cash checks, a large portion of which he was entitled to, sent to him while he was in that nursing home and when the RO had previously expressly affirmed its awareness that he was under VA's auspices. In fact, the RO on May 23, 1996, appears to have acknowledged that its own error had been the cause of the overpayment in this case, when it stated that the "overpayment occurred due to a delay in reducing your [SMC] to the hospitalized rate". R. at 81. Accordingly, the facts of this case differ materially from those in *Jordan, supra*, and, in view of the foregoing analysis, the Court holds that the Board's factual finding that the veteran had "reason to believe" (R. at 6) that he was not entitled to the checks that he received did not have a plausible basis in the record and was thus clearly erroneous. *See* 38 U.S.C. § 7261(a)(4); *Gilbert, supra.*

Absent the "reason to believe" cited by the Board, there is no basis in law for the Board's conclusion that the overpayment debt was validly created and, accordingly, the Court reverses the Board's decision and holds, on de novo review, that the overpayment in this case was created "by

reason of an erroneous award based solely on administrative error", and, therefore, cannot serve as the basis of an overpayment debt owed to VA from the veteran. 38 U.S.C. § 5112(b)(10); *see* 38 C.F.R. § 3.500(b)(2); *see also Jordan*, 10 Vet.App. at 174 ("question whether the BVA erred in determining the validity of the creation of debt is a question of law, which this Court reviews de novo"). In effect, the creation of the overpayment debt on the facts of this case was void ab initio, just as we have held that rating reductions effected without compliance with applicable regulations are "void ab initio". *Greyzck v. West*, 12 Vet.App. 288 (1999) (citing *Kitchens v. Brown*, 7 Vet.App. 320, 325 (1995); *Murincsak v. Derwinski*, 2 Vet.App. 363, 369 (1992); and *Schafrath v. Derwinski*, 1 Vet.App. 589, 596 (1991)); *see also Dofflemyer v. Derwinski*, 2 Vet.App. 277, 280-81 (1992).

### III. Conclusion

Upon consideration of the foregoing analysis, the ROA, and the submissions of the parties, the Court reverses the July 30, 1997, BVA decision and remands the matter for the repayment to the veteran by VA of the overpayment debt that VA wrongfully collected.

REVERSED AND REMANDED.

HOLDAWAY, *Judge,* dissenting: I respectfully dissent with the holding of the majority. I do so reluctantly because the result reached by the majority is a good *equitable* result, given the fact that the VARO's negligence and actions, as ably noted in the majority opinion, were certainly the principal cause in creating the overpayment to the appellant. However, this Court is a court of law, not a court of equity. Unless the Board was clearly erroneous in its factual finding that VA was not *solely* to blame, this Court cannot overturn that finding, no matter how much we may wish to do so out of sympathy for this appellant.

My review of this case ineluctably leads me to the conclusion that the Board's finding was firmly based in the record which clearly indicated that the appellant was well aware of the fact that he was receiving overpayments. The inescapable conclusion is that while VA was primarily at fault for the creation of the overpayment, there still is an element of fault on the appellant's part because he accepted money to which he was not entitled. To find that VA was not solely to blame is not intended to excuse the errors made in creating the overpayments but simply applies the requirements for a valid creation of the debt set forth by the law. Had the appellant pursued an equitable waiver

9

of this valid debt, I believe that there would have been a strong case for relief, assuming that the other factors for waiver had been present. *See* 38 C.F.R. § 1.965. Nonetheless, the appellant sought to deny the validity of the indebtedness and argued that this error was solely the fault of VA and, for whatever reason, eschewed a request for waiver of the indebtedness.

I note parenthetically that to the extent that there is an inference that VA acted somewhat ogreishly in attempting to recover an overpayment which its negligence was largely responsible for creating, it should be borne in mind that the appellant did receive monies to which he was not legally entitled. VA acted reasonably and responsibly in trying to recapture the windfall that the appellant received.